**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald Wolfson, | No. CV-17-08258-PCT-DWL |
| Wolfson, | **ORDER** |
| v. | |
| Bayview Loan Servicing LLC, et al., | |
| Defendants. | |

Pending before the Court are (1) a motion to withdraw and amend Rule 36 responses filed by Plaintiff Ronald Wolfson (Doc. 57) and (2) a motion for summary judgment filed by Defendants Bayview Loan Servicing, LLC ("Bayview") and Bank of New York Mellon ("BONY") (collectively "Defendants") (Doc. 55). Both motions are fully briefed and nobody has requested oral argument. For the following reasons, both motions will be granted.

## BACKGROUND

I. <u>Factual History</u>

Defendants filed various exhibits in support of their motion for summary judgment (Doc. 55 at 21-104) and Wolfson filed various exhibits in support of his opposition (Doc. 56 at 19-125). Additionally, Wolfson attached various documents as exhibits to his amended complaint (Doc. 33-1). The summary below is derived from those materials. Any disputed facts are resolved in Wolfson's favor, because he is the party opposing summary judgment.

In May 2007, Wolfson executed a $272,000 promissory note that was secured by a deed of trust on his home in Prescott, Arizona. (Doc. 55 at 28-30.) The deed lists Quicken Loans as the lender and Mortgage Electronic Registration Systems, Inc. ("MERS"), a nominee for the lender and its successors, as the beneficiary. (Doc. 55 at 33-34.)

On September 27, 2007, Wolfson filed for Chapter 7 bankruptcy. (Doc. 33 ¶ 14.)

On June 20, 2008, the bankruptcy court entered a discharge order. (Doc. 33-1 at 6.)

Between May 2007 and May 2010, Wolfson made the scheduled monthly payments on his mortgage. (Doc. 55 at 25 ¶ 9; Doc. 56 at 51.) However, on June 1, 2010, Wolfson defaulted by failing to make the required monthly payment. (*Id.*)

Wolfson testified during his deposition that he was instructed by a Bank of America representative to miss the June 2010 payment because this was the only way he could qualify for a loan modification. (Doc. 56 at 66.) Wolfson then applied to Bank of America for a loan modification, but this request was denied because "it didn't meet investor guidelines." (*Id.*)

On July 19, 2010, Wolfson received a letter from Bank of America entitled "Notice of Intent to Accelerate." (Doc. 56 at 69.) Among other things, this letter stated that Wolfson's loan was currently "in default," that Wolfson had "the right to cure the default," that Wolfson could do so by paying $2,856.29 by August 18, 2010, and that "[i]f the default is not cured on of before August 18, 2010, the mortgage payments will be accelerated with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time." (*Id.*)

On November 18, 2010, the Yavapai County Recorder recorded a "Corporation Assignment of Deed of Trust Arizona" under which MERS assigned all beneficial interest in the note and deed of trust to BONY. (Doc. 55 at 25 ¶ 10, 53.)

In March 2011, Wolfson filed a lawsuit in state court in which he sought to challenge, *inter alia*, the validity of the 2010 assignment. (Doc. 33 ¶ 24.) In March 2012, the trial court dismissed Wolfson's complaint, and on March 11, 2014, the Arizona Court of Appeals affirmed. (Doc. 33 ¶ 27; Doc. 55 at 88-94.)

On February 9, 2012, MERS made a second assignment to BONY of Wolfson's note and deed of trust. (Doc. 33-1 at 13.)[1]

On October 16, 2012, Bayview obtained the servicing rights for the note. (Doc. 33-1 at 15-17; Doc. 55 at 25 ¶ 11.)

On November 28, 2012, Wolfson received a letter from Bayview. (Doc. 56 at 95.) Among other things, it apologized to Wolfson for erroneously sending him a "Debt Validation Letter" and stated that "we are aware that your loan has been discharged through Bankruptcy Chapter 7." (*Id.*)

On September 4, 2014, Bayview sent a letter concerning Wolfson to the Arizona Attorney General's Public Advocacy and Civil Rights Division. (Doc. 56 at 97.) This letter acknowledged that because Wolfson had gone through bankruptcy in 2008, he "may no longer have personal liability on the Note," but also noted that "the property is still subject to the lien of the security instrument and is subject to foreclos[ure] if unpaid." (*Id.*)

On April 27, 2016, Bayview sent Wolfson a "Notice of Default and Intent to Accelerate," which informed Wolfson that if he failed to cure the default by June 1, 2016, Bayview intended to initiate foreclosure. (Doc. 33-1 at 27-29.)

In response, Wolfson sent various letters to Bayview disputing the debt. (Doc. 33-1 at 31 [response letter from Bayview, acknowledging that it was in response to "recent correspondence" from Wolfson]; Doc. 56 at 99-101 [Wolfson's May 2016 letter].)

On June 22, 2017, Joseph Tirello Jr. ("Tirello") was appointed to serve as the new trustee of Wolfson's deed of trust via a document entitled "Substitution of Trustee," which was recorded on July 3, 2017. (Doc. 33-1 at 41; Doc. 55 at 55.)

On July 3, 2017, a "Notice of Trustee's Sale" with recorded with the Yavapai

---

[1] Defendants didn't file a copy of this document as an attachment to their summary judgment motion and Wolfson didn't file a copy as an attachment to his opposition to the summary judgment motion. Therefore, the only copy in the record is an unauthenticated copy attached to the amended complaint, which has the phrase "Unofficial Copy" stamped across it. (Doc. 33-1 at 13.) Nevertheless, Wolfson referred to the 2012 assignment during his deposition, and the relevant portion of his deposition transcript is part of the summary judgment record (Doc. 56 at 85-87), and Defendants acknowledged in their reply that the 2012 assignment did occur. (Doc. 62 at 3 ["[T]he 2012 Assignment had no effect on title because MERS had already transferred the beneficial interest in the Deed of Trust to BONYM in the 2010 Assignment."].)

County Recorder. (Doc. 33-1 at 37-38; Doc. 55 at 57-58.) This document identifies BONY as the beneficiary. (*Id.*)

II. Procedural Background

On November 7, 2017, Wolfson initiated this action by filing a complaint in state court. (Doc. 1 at 7-21.)

On November 30, 2017, Defendants removed the case to this Court. (Doc. 1.)

On January 8, 2018, Wolfson filed an amended complaint. (Doc. 33.) It asserts six causes of action. The first four claims are asserted against both BONY and Bayview: (1) false recordings; (2) breach of the implied covenant of good faith and fair dealing; (3) fraudulent misrepresentation; and (4) breach of contract. (*Id.* ¶¶ 50–115.) The final two claims are asserted only against Bayview: (5) violation of the Fair Debt Collections Practices Act ("FDCPA"); and (6) violation of the Real Estate Settlement Procedures Act ("RESPA"). (*Id.* ¶¶ 116-72.)

On January 19, 2018, Defendants served Wolfson with the First Set of Request for Admissions, First Set of Production of Documents and Non-Uniform Interrogatories. (Doc. 38 [notice of filing]; Doc. 58 at 5-12 [actual request].)

On March 27, 2018, Wolfson's counsel wrote an email to Defendants' counsel stating that "[t]oday I discovered to my horror that we are late in responding to Bayview's written discovery propounded January 19th, it appears. I had a significant medical issue and missed the date. I will have full responses to you by Friday. Please advise if you will agree to this belated request for an extension." (Doc. 58 at 17.)

Later that day, Defendants' counsel sent an email to Wolfson's counsel denying the extension request. (Doc. 58 at 15-16.)

On March 28, 2018, Wolfson's counsel responded via email by asking Defendants' counsel "to reconsider your harsh position on the RFAs. I will object to the court to them being deemed admitted. I had a medical emergency involving hospitalization that I can verify, but I would not think that professionalism would allow such an invasion of privacy." (Doc. 58 at 15.) Wolfson's counsel also enclosed with this email a completed response to

- 4 -

the request for admissions. (*Id.* at 20-26.)

On January 25, 2019, Defendants moved for summary judgment. (Doc. 55.)

On February 25, 2019, Wolfson filed an opposition to the summary judgment motion. (Doc. 56.)

On February 25, 2019, Wolfson separately filed a formal motion to amend and withdraw his Rule 36 responses. (Doc. 57.) This motion was supported by a declaration from Wolfson's counsel. (Doc. 58.)

On March 8, 2019, Defendants filed an opposition to Wolfson's motion to withdraw. (Doc. 60.)[2]

On March 12, 2019, Defendants filed a reply in support of their summary judgment motion. (Doc. 62.)

**DISCUSSION**

I. Motion to Withdraw

Defendants sent a request for admissions ("RFA") to Wolfson on January 19, 2018. Wolfson's response was due within 30 days. *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served [with a request for admissions], the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."). Unfortunately, Wolfson did not comply with this deadline. On March 27, 2018—about a month after the RFA response was due—Wolfson's counsel sent an email to Defendants' counsel apologizing for the error (which, according to Wolfson's counsel, was due to a "significant medical issue") and asking for an extension. Defendants' counsel rejected this request. The following day (March 28, 2018), Wolfson's counsel sent the completed RFA response to Defendants' counsel. Nothing happened on the RFA front for the next year or so. Finally, after Defendants sought to rely on Wolfson's "deemed admissions" in their summary judgment motion, Wolfson quickly filed a formal motion to withdraw those admissions.

Wolfson's request is governed by Rule 36(b) of the Federal Rules of Civil

---
[2] Wolfson never filed a reply in support of his motion to withdraw.

Procedure, which provides that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. . . . [T]he court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." As the Ninth Circuit has summarized: "Two requirements, therefore, must be met before an admission may be withdrawn: (1) presentation of the merits of the action must be subserved, and (2) the party who obtained the admission must not be prejudiced by the withdrawal." *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995). Additionally, "[t]he party seeking withdrawal . . . bears the burden of showing that granting the motion will promote the presentation of the merits," while "[t]he party opposing the motion bears the burden of showing that it will be prejudiced if the admission is allowed to be withdrawn." S. Gensler, 1 *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 36, at 1029-30 (2018) (hereinafter "Gensler").

The Ninth Circuit has further emphasized that "[t]he text of Rule 36(b) is permissive." *Conlon v. United States*, 474 F.3d 616, 624 (9th Cir. 2007). Thus, even "when a district court finds that the merits of the action will be subserved and the nonmoving party will not be prejudiced, it 'may' allow withdrawal, but is not required to do so . . . ." *Id.* at 625. Also, a "district court may consider other factors, including whether the moving party can show good cause for the delay and whether the moving party appear to have a strong case on the merits." *Id.*

Here, the first factor under Rule 36(b) favors Wolfson. The topics addressed in the RFA—among other things, whether MERS had the authority to assign the deed of trust, whether Quicken Loans and its successors had the authority to substitute the trustee, and whether BONY is the current beneficiary under the deed of trust—go to the heart of the first and second causes of action in the amended complaint. Indeed, Defendants have asked the Court to grant summary judgment in their favor on those two claims based solely on Wolfson's deemed admissions. (Doc. 55 at 9-10.) This is a textbook example of a situation

where the withdrawal of admissions would "promote the presentation of the merits of the action." *See* Fed. R. Civ. P. 36(b).

Defendants disagree, arguing that upholding Wolfson's admissions would "not practically eliminate any presentation of the merits of the case" because Wolfson's complaint contains six causes of action and his admissions would only eliminate two of his claims. (Doc. 60 at 2.) This argument is unavailing. In *Gallegos v. City of Los Angeles*, 308 F.3d 987 (9th Cir. 2002), the Ninth Circuit held that the first Rule 36(b) factor was satisfied where the admissions merely threatened to prevent the merits-based resolution of "*[o]ne* of the issues in this case." *Id.* at 993 (emphasis added). This undermines any suggestion that the admissions must affect every issue in the case for the first Rule 36(b) factor to be satisfied.

The second factor under Rule 36(b)—prejudice—also favors Wolfson. Notably, in their March 27, 2018 email denying Wolfson's extension request, Defendants didn't articulate any reasons why a one-month extension would be prejudicial to them. Instead, Defendants' counsel essentially stated that he was tired of extending professional courtesy to other attorneys: "To date, we have worked in a professional matter. We both have extended professional courtesies to each other. And I appreciate such professional courtesies. Unfortunately, any proposed courtesy or extension will not reverse the fact that the requests for admissions are deemed admitted." (Doc. 58 at 16.) This is a disappointing, to put it mildly, display of professionalism and falls far short of what is expected of attorneys practicing before this Court. *Cf. Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1263 (9th Cir. 2010) (faulting attorney for refusing to agree to a one-week extension request by opposing counsel and emphasizing that "[o]ur adversarial system relies on attorneys to treat each other with a high degree of civility and respect").

Defendants' response to the motion to withdraw fares no better. Although the heading on page three of Defendants' response states that "Defendants will be Prejudiced by Withdrawal or Amendment of the Admissions," the text underneath this heading doesn't touch upon the issue of prejudice at all. Instead, it identifies various reasons why the Court

should conclude Wolfson lacked "good cause" for the delay. (Doc. 60 at 3-4.) Such conflation is unhelpful—whether Defendants were prejudiced by a one-month delay in receiving Wolfson's response to their RFA is an entirely separate issue from whether Wolfson had good cause for missing the initial deadline. Indeed, any consideration of "good cause" is discretionary and comes only after the Court has completed its analysis of the two factors (merits-based resolution and prejudice) set forth in the text of Rule 36. *Conlon,* 474 F.3d at 624. Because Defendants haven't offered any arguments touching upon the issue of prejudice, they haven't met their burden of proving prejudice. [3]

Finally, there is the discretionary factor of "good cause," which Defendants argue is lacking because Wolfson "say on his hands for almost one year" before making a withdrawal request. (Doc. 60 at 3-4.) This argument misses the mark. Although Wolfson didn't file a formal motion to withdraw his admissions until February 2019, Defendants have been on notice since March 2018 that Wolfson was contesting their "deemed admitted" theory. Defendants haven't identified any authority holding that Wolfson was required to file a formal withdrawal motion at that time. To the contrary, the relevant cases suggest that Wolfson's conduct here—first, stating in his opposition to the summary judgment motion that he was disputing Defendants' admission theory, and second, filing a separate motion to withdraw—was more than sufficient to safeguard his rights. *See, e.g.*, *Friedman v. Live Nation Merchandise, Inc.*, 833 F.3d 1180, 1185 (9th Cir. 2016) (holding that "a request for relief under Rule 36(b)" need not "be brought in a separate motion"); *Bergemann v. United States*, 820 F.2d 1117, 1121 (10th Cir. 1987) (holding that district court properly granted withdrawal request and rejecting as "overly technical" the opposing

---

[3] Moreover, even if Defendants had attempted to show prejudice, such an attempt would have been unsuccessful. Wolfson delivered his completed RFA response to Defendants on March 28, 2018. This document showed that Wolfson was disputing many of the issues that Defendants wish to deem admitted. And at the time this document was provided to Defendants, the discovery cutoff was still many months away. Courts have declined to find prejudice under analogous circumstances. *See, e.g., Johnson v. Target Corp.*, 487 Fed. App'x 298, 300 (7th Cir. 2012) ("There is no prejudice if the withdrawing party's submissions have otherwise consistently denied the admitted facts, the party opposing the withdrawal conducted thorough discovery, or the withdrawal is made before trial and discovery may be reopened."). *See also Conlon*, 474 F.3d at 624 ("[R]eliance on a deemed admission in preparing a summary judgment motion does not constitute prejudice.").

party's argument that the request was improper because it was not raised in a formal withdrawal motion). *See generally* Gensler at 1028 ("[W]hen parties file other papers that seek action inconsistent with the admissions, many courts will construe those filings as a motion to withdraw . . . even though no formal motion to withdraw . . . was made.").

On the other hand, the Court does acknowledge that Wolfson's counsel's excuses for missing the February 2018 response deadline are not particularly compelling. Specifically, although Wolfson's counsel contends that an office move in December 2017 and brief hospitalization in January 2018 explain why she didn't initially realize the RFA had been mailed to her (Doc. 58 at 2 ¶ 2), both of these events occurred before the RFA was mailed on January 19, 2018. Additionally, she received electronic notice of the mailing via the Court's docketing system on January 23, 2018. (Doc. 38.) And other filings by Wolfson's attorney show she attended a meeting with Defendants' counsel on January 24, 2018. (Doc. 41 at 1.) All of this suggests Wolfson should have been able to respond to the RFA within 30 days. Nevertheless, because Wolfson's counsel was experiencing a fair degree of upheaval around the time the RFA was sent to her, the Court concludes the "good cause" factor is, on balance, neutral.

In sum, because both of the Rule 36(b) factors favor allowing Wolfson to withdraw his admissions and the discretionary "good cause" factor is neutral, the Court will exercise its discretion to grant Wolfson's withdrawal motion.

II. <u>Motion for Summary Judgment</u>

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at

trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### A. Count One: False Recordings

In Count One of the amended complaint, Wolfson asserts a claim for "False Recordings" in violation of A.R.S. § 33-420. (Doc. 33 ¶¶ 50-92.) In a nutshell, Wolfson alleges that three documents that were recorded with the county recorder—(1) the "Assignment of Deed of Trust" recorded in February 2012 (Doc. 33-1 at 13), (2) the "Substitution of Trustee" recorded on July 3, 2017 (Doc. 33-1 at 41), and (3) the "Notice of Trustee's Sale" recorded on July 3, 2017 (Doc. 33-1 at 37-38)—contain certain false statements.

Defendants first seek summary judgment on Count One based on the doctrine of res judicata—specifically, due to the fact that, in 2014, the Arizona Court of Appeals rejected an earlier lawsuit by Wolfson that included a false recordings claim under A.R.S. § 33-420. (Doc. 55 at 6–8.) This argument is unavailing. Res judicata is applicable when "there

is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1150 (9th Cir. 2011). In determining if there is an identity of claims, the Court considers "whether the two suits arise out of the same transactional nucleus of facts." *Id.* (quotation and citations omitted). Here, the two lawsuits do not arise out of the same transactional nucleus of facts because this lawsuit seeks to challenge various documents that were recorded between 2012-17 whereas Wolfson's earlier lawsuit sought to challenge a different document that was recorded in 2010. Thus, although the Court is free to consider (for persuasive purposes) the Arizona Court of Appeals' rationale for rejecting Wolfson's earlier claim, his defeat in that lawsuit does not foreclose him (for res judicata purposes) from attempting to dust off the legal theory that failed in that case and advance it here with respect to a different set of facts.

Defendants next seek summary judgment on Count One based on Wolfson's failure to timely respond to—and thus admit—the portions of their RFA addressing his false recordings claim. (Doc. 55 at 9 ["Count One . . . Fails Because Plaintiff Admitted The Recordings Are Valid . . . ."].) But as noted in Part I above, the Court has granted Wolfson's request to withdraw those admissions.

On the merits, Wolfson's false recordings claim hinges on the notion that the 2012 assignment was invalid because (1) the note and deed of trust were previously assigned, by no later than June 2007, to a mortgage-backed security trust, so the 2012 assignment "could not have occurred as represented by the [2012] recording[]" (Doc. 33 ¶ 56), and (2) MERS cannot convey an interest greater than what it owns, and MERS admitted in a previous lawsuit that it does not have any interest in promissory notes (*id.* ¶ 57.)

These arguments lack merit. In Wolfson's previous lawsuit, the Arizona Court of Appeals rejected his false recordings claim pertaining to the 2010 assignment in part because it concluded that MERS had the authority to make such an assignment. (Doc. 55 at 93 ["We also reject Wolfson's contention that material misrepresentation or false claims exist in the recorded documents because that contention stems from Wolfson's argument

1 that MERS did not have authority to assign the note to Mellon. This argument fails for the
2 reasons stated above. Thus, Wolfson has not established that the recorded documents
3 contained misrepresentations (material or otherwise) or false claims."].) The Court agrees
4 with this analysis, which undermines Wolfson's challenge to the 2012 assignment (and the
5 2017 recordings based on the 2012 assignment). Furthermore, Wolfson's challenge rests
6 on a general misunderstanding of the securitization process that has been repeatedly
7 rejected by other courts. *See, e.g., Kuc v. Bank of Am., NA*, 2012 WL 1268126, *3 (D.
8 Ariz. 2012) ("[T]he theory that securitization renders the Deed of Trust unenforceable has
9 been repeatedly rejected."); *White v. IndyMac Bank, FSB*, 2012 WL 966638, *6 (D. Haw.
10 2012) ("The argument that parties lose their interest in a loan when it is assigned to a
11 securitization trust or REMIC has been rejected by numerous courts."); *Washburn v. Bank
12 of Am., N.A.*, 2011 WL 7053617, *5 (D. Idaho 2011) ("This is not a new battlefield. Several
13 courts have rejected various theories that 'securitization of a loan somehow diminishes the
14 underlying power of sale that can be exercised upon a trustor's breach.'") (citation
15 omitted); *Lane v. Vitek Real Estate Indus. Group*, 713 F. Supp. 2d 1092, 1099 (E.D. Cal.
16 2010) ("The argument that parties lose their interest in a loan when it is assigned to a trust
17 pool has also been rejected by many district courts."). Defendants are therefore entitled to
18 summary judgment on Count One.

B. **Count Two: Implied Covenant Of Good Faith And Fair Dealing**

In Count Two of the amended complaint, Wolfson asserts a claim for breach of the implied covenant of good faith and fair dealing. (Doc. 33 ¶¶ 93-102.) In paragraph 100 of the amended complaint, Wolfson identifies a laundry list of reasons why Defendants' conduct was purportedly unfair and improper. Most of the reasons relate to Wolfson's theory that the 2010 and 2012 assignments were invalid—a theory that is unavailing for the reasons discussed in Part II.A above. Additionally, Wolfson accuses Defendants of violating the implied covenant by (1) pursuing foreclosure even though he obtained a bankruptcy discharge in 2008 and (2) pursuing foreclosure despite the expiration of the six-year statute of limitations for doing so.

As an initial matter, the Court rejects Defendants' argument that they are entitled to summary judgment on Count Two based on Wolfson's admissions in response to the RFA. (Doc. 55 at 10.) Because Wolfson has now been allowed to withdraw those admissions, they do not help Defendants' case.

Defendants' next argument is that the implied covenant claim "fails as a matter of law" because such a claim must be based on "the terms of the contract at issue" but none of Wolfson's theories are based on "the terms of the Note or Deed of Trust." (Doc. 55 at 11.) Notably, Wolfson does not address—much less attempt to rebut—this argument in his response to the summary judgment motion. (Doc. 56 at 13-15.) Instead, he simply plunges into a discussion of why the statute of limitations should be deemed to have expired. (*Id.*)

The Court agrees that Defendants are entitled to summary judgment on this basis. By failing to respond to Defendants' argument, Wolfson effectively conceded it. Additionally, many courts have concluded that a homeowner attempting to challenge a foreclosure may not do so under the guise of an implied covenant claim—there are other, more appropriate legal theories by which to raise such a challenge. *See, e.g., Moenig v. Bank of America, N.A.*, 2014 WL 5473554, *7 (E.D. Cal. 2014) (rejecting homeowner's argument that a deed of trust "has an implied covenant not to pursue a wrongful foreclosure," emphasizing that "the underlying purposes of the promissory note and deed of trust are (1) that [plaintiff] shall be able to use the loaned funds on the terms and at the interest rate specified in the promissory note, and (2) that [the bank] shall have the security provided by the deed of trust," and concluding that such purposes do not "give rise to an implied covenant not to foreclose wrongfully"); *Aghajanyan v. Greenpoint Mortgage Funding*, 2014 WL 4748277, * 5 (C.D. Cal. 2014) (rejecting homeowner's argument that an allegedly invalid foreclosure proceeding "constitutes a breach of the covenant" because "plaintiff has not pointed to a specific contractual provision that was frustrated"). *See generally Carter v. HSBC Mortgage Corp.*, 2010 WL 4792638, *3 (D. Ariz. 2010) (in Arizona, "the covenant . . . 'does not extend beyond the express terms of the contract at

issue'") (citation omitted).[4]

C. **Count Three: Fraudulent Misrepresentation**

In Count Three of the amended complaint, Wolfson asserts a claim for fraudulent misrepresentation. (Doc. 33 ¶¶ 103-110.) The theory underlying this claim is that Defendants committed fraud by acknowledging in 2012 that his debts had been discharged via bankruptcy but then making subsequent efforts to collect delinquent payments from him. (*Id.*)

In their motion, Defendants argue that Count Three should be rejected because Wolfson "is confusing a discharge of his obligation to pay a debt in bankruptcy with satisfaction of the debt itself." (Doc. 55 at 14-15.) In response, Wolfson argues that "[t]he crux of the fraud is that Defendants misrepresented in writing the status of the loan and the actions that Defendants would take to collect the loan." (Doc. 56 at 15.) In support of this assertion, he points to two documents: (1) a November 2012 letter he received from Bayview, which told him to "disregard" a debt validation letter he'd received a few weeks earlier because "we are aware that your loan has been discharged through Bankruptcy Chapter 7" (Doc. 56 at 95), and (2) an undated and unsigned letter that he apparently wrote to Bayview, which he purportedly wrote after receiving a "Notice of Default and Intention

---

[4] Given this conclusion, it is unnecessary to decide whether Defendants' pursuit of foreclosure proceedings was wrongful. Nevertheless, Wolfson's bankruptcy-related theory of wrongfulness is easily rejected. A bankruptcy extinguishes only the debtor's personal obligations, leaving intact the creditor's right to proceed against the debtor *in rem. Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991) ("Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property."). As for Wolfson's statute-of-limitations theory of wrongfulness, the "Notice of Intent to Accelerate" he received from Bank of America in July 2010 (Doc. 56 at 69) didn't trigger the statute of limitations because it didn't say that acceleration *had* occurred—it merely noted the possibility that the right to accelerate *could* be exercised in the future. *See, e.g., Hummel*, 2018 WL 3744858 at *4 (finding defendant's "notice of default and intent to accelerate does not 'make clear' that the debt had in fact been accelerated"); *Gard v. Ocwen Loan Servicing LLC*, 2019 WL 3718972, *6 (D. Ariz. 2019) (same). As for the "Notice of Trustee's Sale" that was purportedly recorded in November 2010, although the recording of such a document can constitute acceleration under Arizona law, Wolfson didn't attach a copy of this document to his complaint or response to the summary judgment motion and Defendants included, as an attachment to their motion, a declaration from a Bayview employee averring that "[m]y review of the Loan records reflects that the Loan has never been accelerated." (Doc. 55 at 26 ¶ 16.)

- 14 -

to Accelerate" in May 2016 (Doc. 56 at 99-101).

Defendants are entitled to summary judgment on Count Three. In the letters at issue, Defendants acknowledged that Wolfson's personal liability had been extinguished by his bankruptcy but stated they were still intent on pursuing foreclosure. There is nothing inconsistent or contradictory (let alone fraudulent) about taking those positions. *Johnson*, 501 U.S. at 84. Indeed, Wolfson's bankruptcy order expressly noted that although "[t]he discharge prohibits any attempt to collect from the debtor a debt that has been discharged . . . a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy." (Doc. 33-1 at 7.)

### D. **Count Four: Breach Of Contract**

In Count Four of the amended complaint, Wolfson asserts a claim for breach of contract. (Doc. 33 ¶¶ 111-115.) The theory underlying this claim is if BONY and/or Bayview received an insurance payment to compensate them for the losses associated with his default, they were required by three different contracts—"The PSA, the Servicing Agreement, and the Master Purchase Agreement"—to release the deed. (*Id.*)

In their motion, Defendants argue that Count Four fails because Wolfson "has not asserted any facts to support th[e] wild conclusion" that they already received insurance proceeds to pay off the loan. (Doc. 55 at 15.) They further note that "[t]he Loan records clearly reflect that the loan has not been paid off . . . from insurance or otherwise." (*Id.*) In support of this claim, Defendants point to a declaration from a Bayview employee averring that "the Loan has not been paid off, satisfied or otherwise settled." (Doc. 55 at 26 ¶ 18.) In his response, Wolfson sole argument concerning Count Four is that "Bayview relies on deemed admissions." (Doc. 56 at 15.)

Defendants are entitled to summary judgment on Count Four. That claim is premised on the notion that an insurance company paid off Wolfson's loan after he defaulted. Defendants argued in their motion that Wolfson doesn't have any evidence to support that contention—which is a permissible basis for seeking summary judgment under Rule 56 and *Celotex*—and Wolfson offered nothing in response. *Cf. In re Brazier Forest*

*Products, Inc.*, 921 F.2d 221, 223-24 (9th Cir. 1990) ("[I]f the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case. The nonmoving party must then make a sufficient showing to establish the existence of all elements essential to their case on which they will bear the burden of proof at trial. If the nonmoving party fails to make such a showing, summary judgment will be granted.").

### E. **Count Five: FDCPA**

In Count Five of the amended complaint, Wolfson asserts a claim against Bayview for violations of the FDCPA. (Doc. 33 ¶¶ 116-135.) This claim is premised on a series of letters that Wolfson sent to Bayview disputing whether he owed a debt[5] and a series of letters from Bayview to Wolfson on that topic.[6]

Bayview argues that (1) many of the documents at issue fall outside the FDCPA's one-year statute of limitations and (2) the few remaining documents don't violate the FDCPA because they were "required by the Deed of Trust statutes as part of a non-judicial foreclosure proceeding" and the "non-judicial foreclosure of a deed of trust is not debt collection under the FDCPA." (Doc. 55 at 15-17.) In response, Wolfson argues that (1) under *Dowers v. Nationstar Mortgage, LLC*, 852 F.3d 964 (9th Cir. 2017), attempts to enforce a non-judicial foreclosure can violate the FDCPA, and (2) the Montana Supreme Court's decision in *Jacobsen v. Bayview Loan Servicing, LLC*, 371 P.3d 397 (Mont. 2016), shows that foreclosure-related correspondence can violate the FDCPA if it goes beyond

---

[5] The letters were allegedly sent on the following dates: November 20, 2012 (Doc. 33 ¶ 30); November 21, 2012 (Doc. 33 ¶ 31); May 20, 2013 (Doc. 33 ¶ 33); June 27, 2013 (Doc. 33 ¶ 34; Doc. 33-1 at 21-23); July 8, 2013 (Doc. 33 ¶ 34); October 8, 2013 (Doc. 33 ¶ 34); August 1, 2017 (Doc. 33 ¶ 48); and October 2017 (Doc. 33 ¶ 49). The amended complaint also mentions another letter Wolfson sent to Bayview but doesn't specify when it was sent. (Doc. 33 ¶ 39.)

[6] These include Bayview's response to Wolfson's inquiry dated November 28, 2012 (Doc. 33 ¶ 32; Doc. 33-1 at 19); Bayview's letter to the Attorney General's office dated September 4, 2014 (Doc. 33 ¶ 36; Doc. 33-1 at 25); the Notice of Default and Intent to Accelerate dated April 27, 2016 (Doc. 33 ¶ 120; Doc. 33-1 at 27-29); Bayview's response dated June 7, 2016 (Doc. 33 ¶ 41; Doc. 33-1 at 31-33); and a "Debt Validation Notice," which was sent by Bayview's law firm, dated July 7, 2017 (Doc. 33 ¶ 121; Doc. 56 at 118).

the foreclosure and seeks "collection of a money debt." (Doc. 56 at 15-16.)

As an initial matter, Bayview is correct that many of the documents at issue fall outside the statute of limitations. An action under the FDCPA is subject to a one-year statute of limitations. 15 U.S.C. § 1692k. Because Wolfson commenced this action on November 7, 2017, claims based on communications before November 7, 2016 are time-barred. Thus, the Court considers only communications that occurred within the statute of limitations. Specifically, the only post-November 2016 communications identified in the amended complaint are (1) Wolfson's letter to Bayview of August 1, 2017 (Doc. 33 ¶ 48), (2) Wolfson's letter to Bayview in October 2017 (Doc. 33 ¶ 49), and (3) the "Debt Validation Notice" that was sent to Wolfson on July 7, 2017 (Doc. 33 ¶ 121; Doc. 56 at 118). Additionally, Bayview argues in its motion (Doc. 55 at 16) that the FDCPA claim is premised on three additional post-November 2016 documents: (1) the "Statement of Breach or Non-Performance" sent from Bayview to Wolfson on July 3, 2017 (Doc. 33-1 at 35); (2) the "Notice of Trustee's Sale" dated July 3, 2017 (Doc. 33-1 at 37-38); and (3) the "Substitution of Trustee" dated July 3, 2017 (Doc. 33-1 at 40-41).

The Court further notes that, although the amended complaint alleges that Bayview violated an array of different provisions within the FDCPA, many of those claims are foreclosed by the Supreme Court's recent decision in *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1038 (2019). Specifically, the statutory provisions on which Wolfson relies apply only to the conduct of a "debt collector" (*see* 15 U.S.C. §§ 1692e–g), and the Supreme Court held in *Obduskey* that, "but for § 1692f(6), those who engage in only nonjudicial foreclosure proceedings are not debt collectors within the meaning of the [FDCPA]." *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1038 (2019). Thus, Wolfson's claims under 15 U.S.C. §§ 1692e(2), 1692e(5), and 1692g(a)(1) necessarily fail—Bayview, a servicer facilitating a non-judicial foreclosure, does not fall under the FDCPA's general definition of a "debt collector."

This leaves Wolfson's claim under § 1692f(6). Wolfson's theory with respect to that claim is that Bayview improperly "threaten[ed] to foreclose even though Bayview and

BNYM as Trustee had no present right to possession of the property under its security agreement, and by threatening to take other action prohibited by law." (Doc. 33 ¶ 128.)

Bayview is entitled to summary judgment on this claim. Section 1692f(6) of the FDCPA prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property" if one of three conditions is present: (A) "there is no present right to possession of the property claimed as collateral through an enforceable security interest"; (B) "there is no present intention to take possession of the property"; or (C) "the property is exempt by law from such dispossession or disablement." *See* 15 U.S.C. § 1692f(6). Here, subdivision (A) isn't applicable because Bayview had a right to seek non-judicial foreclosure—Wolfson's arguments to the contrary have been rejected in other portions of this order—and Wolfson doesn't contend that subdivisions (B) or (C) are applicable.

F. **Count Six: RESPA**

In Count Six of the amended complaint, Wolfson asserts a claim against Bayview for violations of the RESPA. (Doc. 33 ¶¶ 136-172.) Specifically, Wolfson alleges the following violations: (1) violation of 12 U.S.C. § 2605(d) by improper assessment of a late fee during the transfer period; (2) violation of 12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.35 by failure to correct account errors; and (3) misapplication of Wolfson's payments. (*Id.*)

Bayview argues that Wolfson's first claim is barred by the statute of limitations. (Doc. 55 at 17.) Wolfson does not address this argument in his response (Doc. 56 at 16-17) and the Court, in any event, agrees with Bayview. There is a three-year statute of limitations for violations of § 2605. *See* 12 U.S.C. § 2614. Bayview obtained the servicing rights in 2012, so any claim related to its assessment of late fees during the transfer period had to be filed by 2015. This lawsuit, initiated in November 2017, came too late.

As for Wolfson's second claim, Bayview argues that some of the letters discussed in the amended complaint were sent between 2012-14 (and thus fall outside the statute of limitations) and the remaining letters show that it did, in fact, conduct a reasonable investigation in response to those letters, including compiling an "account activity

statement detailing all transactions and their effective dates, and copies of the Note, Deed of Trust and Assignment." (Doc. 55 at 17, citing Doc. 33-1 at 31-33.) In response, Wolfson argues that Bayview "did not perform a reasonable investigation of the errors" because it "did not investigate, did not give reasons for its determination that there was no error, did not explain its prior misstatement or the new charges that exceeded $100,000.00 on a loan it had referred to as discharged. With fact issues disputed regarding the reasonableness and scope of Bayview's investigation, summary judgment must be denied." (Doc. 56 at 17.)

Bayview is entitled to summary judgment on this portion of Count Six. RESPA requires the "servicer of a federally related mortgage loan to provide a timely response to inquiries from borrowers regarding the servicing of their loans." *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665 (9th Cir. 2012) (citations omitted). However, this duty "does not arise with respect to *all* inquiries or complaints from borrowers to servicers"; rather, an inquiry triggers such a duty only when it seeks "information relating to the servicing of [the] loan." *Id.* at 666 (citation omitted). In contrast, "letters challenging only a loan's validity or its terms [do not] give rise to a duty to respond . . . ." *Id.* at 667.

Here, Wolfson's written inquiries did not trigger a statutory duty to respond. In the letter dated May 21, 2016, Wolfson stated "[t]his is not my debt," challenged the validity of the 2012 assignment, and requested a "full accounting of this account." (Doc. 56 at 99-101.) In the letter dated August 1, 2017, Wolfson stated that he was "disputing this debt and claiming the pending Trustee Sale is illegal and fraudulent." (Doc. 56 at 120-125.) These statements challenge the validity of the debt—they do not identify servicing issues.

Finally, as for Wolfson's third claim, Bayview argues that any allegation of miscredited payments "can be summarily rejected because [Wolfson] did not make any payments on the loan while Bayview was servicing the loan." (Doc. 55 at 18.) Bayview further contends that Wolfson has not proffered any evidence in support of his allegation of mis-credited payments. (*Id.*) In his response, Wolfson doesn't address these arguments.

The Court concludes that Bayview is entitled to summary judgment on this portion

of Count Six, too. It is undisputed that Wolfson made his last payment on May 1, 2010, which is more than two years before Bayview obtained the servicing rights. Without additional evidence, the Court cannot see how Bayview could have misapplied his payments.

***

Accordingly, **IT IS ORDERED** that:

(1) Wolfson's Motion to Withdraw (Doc. 57) is **granted**;

(2) Defendants' Motion for Summary Judgment (Doc. 55) is **granted;** and

(3) The Clerk of Court should enter judgment accordingly and **terminate** this action.

Dated this 9th day of September, 2019.

_____
Dominic W. Lanza
United States District Judge